UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-04477-SB (KSx) | Date: | 8/10/2021 |
|---|---|---|---|

| Title: | *Estate of Daniel Hernandez et al. v. City of Los Angeles et al.* |
|---|---|

| Present: The Honorable | STANLEY BLUMENFELD, JR., U.S. District Judge |
|---|---|

| Victor Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:** **[In Chambers] ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 83]**

     This case stems from the fatal police shooting of Daniel Hernandez (Decedent) on April 22, 2020. Plaintiffs Estate of Daniel Hernandez, Manuel Hernandez, Maria Hernandez, Claudia Sugey Chavez (together, Estate Plaintiffs) and M.L.H., by and through her guardian ad litem Claudia Sugey Chavez (M.L.H.) (collectively, Plaintiffs) filed this action bringing several federal and state civil rights claims. Defendants Toni McBride (Officer McBride), City of Los Angeles (City), and the Los Angeles Police Department (LAPD) have moved for summary judgment, or in the alternative, partial summary judgment as to each of Plaintiffs' claims. (Mot., Dkt. No. 83.) The Estate Plaintiffs and M.L.H. have each filed an opposition,[1] and Defendants have filed a reply. (Estate Opp., Dkt. No. 99; M.L.H. Opp., Dkt. No. 104; Reply, Dkt. No. 108.) The Court finds this matter suitable for

---

[1] In reply, Defendants argue that Plaintiffs have violated the local rules by filing separate oppositions because this is a consolidated case and request that the Court "strike Plaintiffs' excessive briefing." (Reply at 2.) Though the Court would have preferred a coordinated, joint opposition, it shall not strike any opposition.

disposition without oral argument. Fed. R. Civ. P. 78; L.R. 7-15. For the reasons below, the Court **GRANTS** the motion.

## I.  BACKGROUND

The facts below are undisputed unless otherwise noted.[2] Video of the entire encounter is captured on Officer McBride's body-worn camera and the Digital In-Car Video recorder affixed to her patrol vehicle.

At approximately 5:36 p.m. on April 22, 2020, Officer McBride and her partner were responding to a call when they observed a crowd gathered around a traffic collision at the intersection of San Pedro and 32nd Street in Los Angeles. (Defendants' Statement of Uncontroverted Facts (DSUF) 1, Dkt. No. 83-1.) The officers stopped to help. (DSUF 2.) Upon exiting the patrol vehicle, Officer McBride observed several bystanders yelling and screaming and noticed several vehicles had been severely damaged—with occupants still inside. (DSUF 4.) Five or six of the bystanders immediately told Officer McBride that there was a "crazy guy with a knife" in the black truck that had been in the accident and that he was threatening to hurt himself and others. (DSUF 5.) Officer McBride looked into the truck and observed an individual (later identified as Decedent) rummaging around; based on information from her radio broadcast and reports from the bystanders, she identified the man in the truck as the individual with the knife. (DSUF 6.)

---

[2] Estate Plaintiffs dispute Defendants' characterization of several facts in the DSUF. (Estate Statement of Genuine Disputes, Dkt. No. 100.) Those disputes are insufficient to create a genuine issue of material fact. *See Bischoff v. Brittain*, 183 F. Supp. 3d 1080, 1084 (E.D. Cal. 2016) ("The court's decision [on a summary judgment motion] relies on the evidence submitted rather than how that evidence is characterized in the statements."). This is particularly true when the relevant events are captured on video. M.L.H. offers similar disputes based on Defendants' characterization of the Decedent's actions. (M.L.H. Disputed Statement of Facts, Dkt. No. 104-1.) M.L.H. also repeatedly offers argument in response to facts. But "[n]either legal arguments nor conclusions constitute facts." (MSJ Order § 2 (emphasis omitted).) And to the extent M.L.H. raises discovery-based disputes to avoid summary judgment, the Court has already ruled that her lack of diligence precludes relief. (*See* Dkt. No. 91.) The Court may ignore these improper disputes. *See* Fed. R. Civ. P. 56(e).

    After Officer McBride observed Decedent climb out of the truck through the driver's side window, she called to him, "Hey man, let me see your hands. Let me see your hands, man." (DSUF 7-8.) Moments later, Decedent appeared from behind the rear of the truck and approached Officer McBride while wielding a knife. (DSUF 9.) As Decedent closed the distance, Officer McBride ordered him to "Stay right there" and "Drop the knife" while simultaneously giving hand gestures to stop. (DSUF 10.) But Decedent did not comply. (DSUF 11.) As Decedent continued to close the distance, Officer McBride began to back up and again directed him to "Drop the knife! Drop the knife!" (DSUF 12.) Based on Decedent's aggressive behavior and refusal to comply, coupled with the fact that he was shirtless, sweating profusely, and acting jittery and agitated, Officer McBride believed Decedent to be under the influence of either methamphetamine or PCP. (DSUF 13.) Officer McBride again ordered Decedent to "drop the knife"; however, this time, Decedent responded, "I'm not going to drop this knife." (DSUF 15.) Plaintiffs dispute Decedent made this statement. Although Decedent does appear to make some statement, the audio recording of Decedent's verbal response is inaudible.

    Decedent continued to advance towards Officer McBride brandishing the knife in his hand with his arms in a raised position. (DSUF 16.) At this point, Officer McBride raised her weapon from the "low-ready" position and aimed it at Decedent, again ordering him to "Drop it!" (DSUF 17.) After Decedent again refused to comply and continued to advance, Officer McBride, believing Decedent posed an imminent threat to her life and the lives of the bystanders, fired two rounds at Decedent. (DSUF 18-19.) Decedent fell to ground, but immediately got up, and in a crouched stance, attempted to move toward Officer McBride. (DSUF 20.) Officer McBride again ordered Decedent to "Drop it," but he again refused to comply, leading Officer McBride to fire two more rounds at Decedent. (DSUF 21-22.) After Decedent fell on his back and rolled over on his side, still holding the knife and seemingly attempting to get up, Officer McBride fired two final rounds at Decedent. (DSUF 23-24.) When officers went to handcuff Decedent, he still had the knife in his right hand.[3] (DSUF 25.)

---

[3] Plaintiffs place great emphasis on the fact the "knife" was actually a box cutter. (*See* Dkt. No. 104-21 (photograph).) This distinction is not one of any legal significance. A box cutter is still a dangerous bladed object that can be used as a deadly weapon. Moreover, Decedent was wielding the box cutter as a knife by holding it as such and making slashing motions with it.

## II.    LEGAL STANDARD

Summary judgment is appropriate where the record, read in the light most favorable to the non-moving party, shows that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts are those necessary to the proof or defense of a claim, as determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" based on the issue. *Id.* In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50.

The burden is first on the moving party to show an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party satisfies this burden either by showing an absence of evidence to support the nonmoving party's case when the nonmoving party bears the burden of proof at trial, or by introducing enough evidence to entitle the moving party to a directed verdict when the moving party bears the burden of proof at trial. *See Celotex*, 477 U.S. at 325; *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). If the moving party satisfies this initial requirement, the burden then shifts to the nonmoving party to designate specific facts, supported by evidence, showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. If the nonmovant "fails to properly address another party's assertions of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion [or] . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e).[4]

## III.    DISCUSSION

Defendants move for summary judgment on each of Plaintiffs' claims. Defendants argue that Officer McBride did not violate Decedent's Fourth Amendment right, and even if there was a constitutional violation, she is shielded

---

[4] The Estate Plaintiffs have filed evidentiary objections that simply track the DSUF. (*See* Dkt. No. 101.) Defendants have also filed evidentiary objections. (Dkt. No. 108-1.) These objections are overruled as moot.

by the doctrine of qualified immunity.  For the same reasons, Defendants argue that no violation of Plaintiffs' substantive due process rights can be found.  Defendants further argue that because no underlying constitutional violations occurred, no municipal liability can exist.  Finally, Defendants argue that Plaintiffs' state-law claims fail as a matter of law.  The Court addresses each argument in turn.

### A.     Plaintiffs' Fourth Amendment Claim

Plaintiffs' first cause of action is brought under 42 U.S.C. § 1983 against Officer McBride for violation of Decedent's Fourth Amendment rights.  (Compl. ¶¶ 31-39, Dkt. No. 26.)  The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. amend. IV.  In a case involving excessive force, courts examine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  Because "police officers are often forced to make split-second judgments," reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."  *Id.* at 396-97 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1975)).

Defendants argue that Officer McBride's conduct was objectively reasonable and thus did not violate the Fourth Amendment.  (Mot. at 7-13.)  Defendants also argue that even if Officer McBride's actions violated the U.S. Constitution, she is nonetheless entitled to qualified immunity.  (*Id.* at 14-18.)  The Court addresses each argument in turn.

#### 1.     Objectively Reasonable

When evaluating a Fourth Amendment claim, "[i]t is imperative that the facts be judged against an objective standard."  *Terry*, 392 U.S. at 21.  "Factors relevant to assessing whether an officer's use of force was objectively reasonable include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempt to evade arrest by flight."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc) (quoting *Graham*, 490 U.S. at 396).  As a general rule, "[a]n officer's use of deadly force is reasonable [] if the 'officer has probable cause to believe that the suspect poses a significant threat of death or serious

physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (quoting *Garner*, 471 U.S. at 3) (emphasis omitted). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011). But the "most important" factor is "whether the suspect posed an immediate threat to the safety of the officers or others." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (citation omitted). On balance, these factors demonstrate that Officer McBride's actions were objectively reasonable.

First, Plaintiffs argue that the circumstances giving rise to this encounter did not constitute a crime. (Estate Opp. at 7; M.L.H. Opp. at 11.) Even if the Court were to ignore the potential crimes arising out of a serious traffic collision caused by a man who appeared to be under the influence, Decedent was brandishing a knife around a crowd of people in a menacing manner and advancing toward an armed police officer without heeding commands. *See* Cal. Pen. Code § 417(a) (proscribing the brandishing of a deadly weapon in a rude, angry, and threatening manner). Officer McBride reasonably could have construed Decedent's acts leading up to the shooting to constitute serious criminal conduct.

The second and third *Graham* factors also weigh in favor of finding the use of deadly force to be reasonable. Decedent posed an immediate threat and ignored repeated commands to drop his weapon. Defendants cite several cases involving the use of deadly force in response to a knife-wielding suspect. For example, in *Estate of Toribio v. City of Santa Rosa*, officers responded to a call of a knife-wielding man who was acting erratically and cut his roommate. 381 F. Supp. 3d 1179, 1182-83 (N.D. Cal. 2019). After barricading himself in a room, officers ordered the man to come out, but he refused. *Id.* at 1184. The man also ignored repeated commands to drop his knife. *Id.* at 1184-85. After the officers used pepper spray, the man jumped up and exited the room into the hallway with the knife, prompting one officer to fire five shots, which fatally wounded him. *Id.* at 1185-86. The court found that even if the officer was mistaken that the man was charging him, his use of force was justified based on the suspect's refusal to comply with orders, threatening statements, and his movement toward the officer. *Id.* at 1188-89.

Defendants' citation to *Blanford v. Sacramento Cnty.*, 406 F.3d 1110 (9th Cir. 2005) is also instructive. There, police responded to calls that a man was walking down a street in a ski mask brandishing a sword. *Id.* at 1112. After the

6

man attempted to enter a home (later determined to be his parents' home), officers ordered him to drop the sword. *Id.* at 1113. Fearing that he might harm an occupant of the house or someone in the backyard, the officers opened fire after the man again refused to drop the sword. *Id.* The man continued to attempt entry through a gate, and after again refusing a command to drop the sword, was shot a second time. *Id.* The man then turned to the back yard, and still holding the sword, was shot a third time, which rendered him a paraplegic. *Id.* at 1113-14. The three volleys of shots occurred in approximately fourteen seconds. *Id.* at 1114. The Ninth Circuit concluded that the officers reasonably believed that the man posed a serious danger to those in or around the house "because he failed to heed warnings or commands and was armed with edged weapon he refused to put down." *Id.* at 1116.

The facts of this case, viewed in their totality, are even more compelling. Officer McBride stopped at the scene of a very serious car crash; individuals were trapped in their vehicles, and bystanders were yelling and screaming. After being told by bystanders that there was a "crazy guy with a knife," Decedent appeared, shirtless, sweating profusely, and acting erratically. After refusing several commands to drop the knife and stay put, Decedent continued to advance toward Officer McBride, with his arms outstretched. It is well-established that "where a suspect threatens an officer with a weapon such as a gun or knife, the officer is justified in using deadly force." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (collecting cases); *see also George*, 736 F.3d at 838 ("If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."). Only after she was faced with Decedent's repeated refusal to drop his weapon did Officer McBride fire her weapon, and only after Decedent continued to refuse to drop the weapon after being shot and told to drop the weapon did she discharge her weapon again. Under these undisputed circumstances, Officer McBride reasonably concluded that Decedent posed a serious threat.

Plaintiffs offer two primary arguments they believe show that Decedent was not an immediate threat. Neither is persuasive. Plaintiffs first contend that the distance from which Officer McBride fired her weapon (44 feet) rendered the shooting unreasonable. ([Estate Opp.](#) at 8-9; [M.L.H. Opp.](#) at 11-14.) This argument is unpersuasive because Decedent was advancing and had ignored repeated commands to stop and drop his knife, as is evident from the video. Indeed, the Ninth Circuit has rejected this distance-related argument, finding that a suspect who is 55 feet away can still pose an imminent threat because he can cover the distance in a matter of seconds. *See Watkins v. City of San Jose*, No. 15-CV-

05786-LHK, 2017 WL 1739159, at *10 (N.D. Cal. May 4, 2017), *aff'd sub nom. Buchanan v. City of San Jose*, 782 F. App'x 589 (9th Cir. 2019) ("Although the officers may have been in *more* danger if the officers had waited for Decedent to advance closer to the officers, the pace of Decedent's advance and his failure to follow direct commands to drop the knife and get on the ground indicate that the officers had probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer[s].") (citation omitted).

Plaintiffs' second argument is that the number of shots fired by Officer McBride—particularly the fifth and sixth rounds—was unreasonable because Decedent could no longer be considered an imminent threat after the initial two shots were fired. (Estate Opp. at 8-10; M.L.H. Opp. at 14-18.) As Defendants observe, the Supreme Court has rejected this argument, finding the overall number of shots fired is not the correct measure of reasonableness. *See Plumhoff v. Rickard*, 572 U.S. 765, 777-78 (2014) ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."). While Plaintiffs contend that Decedent no longer posed a risk after the initial round of shots was fired, that is plainly contradicted by the video evidence. After the first volley, Decedent, still holding the knife, quickly pops back up and appears positioned to charge at Officer McBride. After the second volley, Decedent hits the ground, and still holding the knife, rolls over from his back and still appears to try to get up—or, at least, it cannot be said that the threat had ended.

Moreover, it is important to evaluate the shooting in the real-world context in which it occurred. A judicial description of a shooting as involving "volleys" is analytically useful so long as it is not used—wittingly or unwittingly—to distort the split-second reality unfolding before the officer who has to make life-and-death decisions with imperfect information and without much time to reflect. The six shots in this case were fired in approximately six seconds. Even after the first two shots, Decedent remarkably continued to rise in the direction of the officer. The question is not whether another officer might have waited to evaluate the rising man's next move to see if he would stop, charge at the officer, or advance toward the crowd. The question is whether firing six shots under these circumstances was unconstitutional. The Supreme Court answered that question in *Plumhoff*: the shooting must stop when "the threat has ended." 572 U.S. at 777-78.

In addition to the three *Graham* factors, Plaintiffs contend that other factors weigh against a finding of reasonableness. (Estate Opp. at 10; M.L.H. Opp. at 12-13.) Specifically, Plaintiffs contend that Officer McBride should have used

various de-escalation tactics and non-lethal alternatives before resorting to deadly force or she should have retreated.  Based on the record evidence, there was not a "clear, reasonable and less intrusive alternative[]" to the use of deadly force.  *Glenn*, 673 F.3d at 876.  This was a fast-evolving, dangerous situation.  Plaintiffs' suggestion that there was "ample time" to devise and implement an alternative plan of action would require the type of second guessing the Supreme Court has condemned.  *See Graham*, 490 U.S. at 396-97 (recognizing "police officers are often forced to make split-second judgments").  Plaintiffs' further suggestion that Officer McBride should have taken into account Decedent's mental state does not call for a different conclusion.  *See Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) (refusing "to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals").  If anything, Decedent's apparent mental state objectively increased the threat assessment.  He had just crashed into a vehicle, a reckless act that caused substantial wreckage; and he emerged from the wreckage in a seemingly crazed and plainly dangerous and menacing state, as he advanced toward an officer who had her gun drawn and was voicing commands that made no impression on him.  An officer confronting these circumstances reasonably could perceive Decedent to have presented a deadly threat not only to the safety of the officers but also to the safety of those in the nearby crowd.

Considering the undisputed circumstances in their totality, Officer McBride did not act unreasonably in using deadly force.  Even if the Court were to find Officer McBride's use of force was unreasonable in whole or part, for the reasons discussed immediately below, she is entitled to qualified immunity.

### 2.     Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'"  *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The purpose of qualified immunity is to provide officers "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  *Messerschmidt v. Millender*, 535 U.S. 535, 546 (2012) (internal quotation marks and citations omitted).  The availability of qualified immunity depends on:  (1) whether there has been a violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged misconduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Lal v. Cal.*, 746 F.3d 1112, 1116 (9th Cir. 2014).  It is within the sound discretion of the

district court to determine which of the two prongs should be addressed first. *Pearson*, 555 U.S. at 236.

Even if the Court were to conclude that Officer McBride violated Decedent's constitutional rights, those rights were not clearly established under Supreme Court and Ninth Circuit authority. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotations and citation omitted). For a right to be clearly established, it "does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Instead, courts must use a case-specific, context driven inquiry. *Mullenix*, 577 U.S. at 12 (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (citation omitted).

As the Ninth Circuit recently framed the issue, "[t]he question . . . is whether 'clearly established law prohibited' [the officer] from using the degree of force that [s]he did in the specific circumstances that the officer[] confronted." *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021). The specific circumstances confronting Officer McBride are not genuinely in dispute: an erratic, knife-wielding suspect, who had previously exhibited a reckless disregard for his own safety and the safety of others by causing a serious car crash, threatened to harm himself and others, ignored repeated commands to drop his weapon, and continued to advance on a uniformed police officer who had a firearm drawn. Even after being shot twice, the suspect did not stop but instead rose from the ground still clutching the knife.

Estate Plaintiffs[5] cite several cases to support the contention that Officer McBride violated a clearly established right. None is persuasive. They first cite

---

[5] Plaintiff M.L.H. also argues that Officer McBride is not entitled to qualified immunity throughout her briefing. (*See, e.g.*, M.L.H. Opp. at 20-23.) Her analysis consists largely of string citations to support the notion that it was clearly established that Officer McBride should not have (1) shot Decedent from the distance she did, and (2) shot him six times, which was a violation of LAPD

*Zion v. County of Orange*, 874 F.3d 1072, 1075-76 (9th Cir. 2017). (Estate Opp. at 15.) There, a man suffering from an episodic seizure bit his mother, cut his roommate with a knife, and stabbed a police officer responding to the call for help. *Zion*, 874 F.3d at 1075. Another responding officer witnessed the event and shot the man nine times. *Id.* After the man fell to the ground, the officer walked up to the man, and from a distance of four feet, fired another nine shots at his body. *Id.* After pausing, the officer then took a running start and stomped on his head three times in what was described as "vicious blows to [the] head." *Id.* The man died at the scene. *Id.* The Ninth Circuit found that the officer's use of deadly force by shooting the decedent—and then stomping on his head three times after taking a running start—was not objectively reasonable. *Id.* at 1075-76. While the officer's initial shots were not excessive, the court determined that even if a jury could find the second volley of shots was justified, no reasonable jury could find the head-stomping of a disabled suspect justifiable. *Id. Zion* is clearly distinguishable. Officer McBride shot a person who appeared intent on ignoring commands to drop his knife and to cease all threatening conduct; even after being shot he remained defiant. *Zion* did not put Officer McBride on notice that the use of deadly force, including the firing of the fifth and sixth shots, was unconstitutional under the circumstances she faced. In *Zion*, the suspect had dropped to the ground after the first nine shots and made "no threatening gestures." *Id.* at 1076. Decedent in this case appeared determined, even once shot, to continue to advance. That was not the case in *Zion*.

Estate Plaintiffs next cite *Lam v. City of Los Banos*, 976 F.3d 986 (9th Cir. 2020). (Estate Opp. at 16.) But this decision post-dates the April 22, 2020 shooting of Decedent. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018) (per curiam) (warning that courts may not deny qualified immunity based on cases that post-date the incident). Plaintiffs nevertheless suggest that Officer McBride was on notice of that case because the district court's unpublished decision pre-dated the shooting. (Estate Opp. at 16 fn. 3 (citing the March 30, 3017 decision denying summary judgment).) However, unpublished authority alone will rarely suffice to show the law was clearly established. *Sorrels v. McKee*, 290 F.3d 965, 971 (9th Cir. 2002). And the unpublished decision in *Lam* did nothing to develop the relevant law, finding only that "if all factual disputes are resolved in Plaintiff's

---

policy. (*Id.*) These arguments largely overlap with Estate Plaintiffs' briefing. Without explanation, Plaintiff M.L.H. cites several out of circuit cases to argue that the law of this circuit was clearly established. Even if the Court were to consider these cases, their value is de minimis in the face of Ninth Circuit and Supreme Court authority that is on point, as explained above.

favor, the jury would find that [the officer] . . . shot [the decedent] twice without provocation and planted a weapon to make it appear that he had instead been attacked." *Tan Lam v. City of Los Banos*, No. 2:15-cv-00531-MCE-KJN, 2017 WL 1179136, at *7 (E.D. Cal. Mar. 30, 2017).

The citation to *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991) is likewise unavailing. (Estate Opp. at 17.) There, a police officer, after announcing his presence, shot a man who allegedly raised his semi-automatic rifle while other officers were entering the man's residence. The wounded man fled the house, turned around, pointed his weapon at the officer, and was shot a second time, this time fatally. *Id*. at 323. In affirming the denial of summary judgment on qualified-immunity grounds, the Ninth Circuit held that a civilian witness contradicted the police version, stating that the officer appeared to shoot the decedent in his back the first time and that the decedent was holding the muzzle of the rifle when he was fleeing and fatally shot the second time. *Id.* at 325. This holding, which is based on a factual dispute, did little to provide guidance about the law applicable to this case.

Finally, Estate Plaintiffs rely on two cases for the proposition that an officer who violates department policy is not entitled to qualified immunity. (Estate Opp. at 17-18 (citing *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (asphyxiating a man by kneeling on his neck) and *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (pepper spraying environmental protestors)).) But even if department policy were the proper yardstick in determining qualified immunity, Plaintiffs cite to no specific policy that prohibited the shooting in this case and instead offer the opinion of their retained use-of-force expert. (*Id.*) A retained expert's opinion does not equate to clearly established law within the meaning of the qualified immunity doctrine.

In sum, the law did not clearly establish that the shooting in this case violated Fourth Amendment standards. Indeed, Supreme Court precedent suggests otherwise. *See Kisela*, 138 S. Ct. at 1151. In *Kisela*, police responded to a 911 call of a woman acting erratically and hacking at a tree with a kitchen knife. When officers arrived and spotted the woman, she approached another person (her roommate) while holding the knife, stopping no more than six feet away. *Id.* Despite the officers' announced presence, drawn weapons, and commands to drop the knife, the woman continued to hold the knife. Fearing for the roommate's safety, one officer fired four shots, striking the suspect. Reversing the Ninth Circuit's denial of qualified immunity, the Supreme Court held that it was "far

from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [the roommate] would violate the Fourth Amendment." *Id.* at 1153. It is similarly far from obvious that the shooting here constituted a constitutional violation. Accordingly, Officer McBride is entitled to summary judgment on Plaintiffs' first cause of action.

### B. Plaintiffs' Fourteenth Amendment Claim

Plaintiffs' third cause of action is brought under 42 U.S.C. § 1983 for interference with familial integrity in violation of the substantive due process clause of the Fourteenth Amendment. (Compl. ¶¶ 55-62.) The Due Process Clause of the Fourteenth Amendment protects against government deprivation of life, liberty, and property of citizens without due process of law. U.S. Const. amend XIV, § 1. Plaintiffs Manuel Hernandez, Maria Hernandez, and M.L.H. seek damages for deprivation of their familial rights with Decedent. Both parents and children of a person killed by law enforcement officers may assert this substantive due process right. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998).

To prevail on a such a claim, a plaintiff must show that the state actor's conduct "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998) (collecting cases). In determining whether an officer's conduct shocks the conscience, a court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citations omitted). If actual deliberation is practical, an officer's deliberate indifference is sufficient to shock the conscience. *Id.* But if an officer is confronted with a fast-paced situation in which deliberation is not practical, his or her conduct will only shock the conscience if the act was committed with a "purpose to harm unrelated to law enforcement activities." *Id.* "Deliberation" is not to be interpreted in the narrow, technical sense of the word used in criminal law. *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008) (citing *Lewis*, 523 U.S. at 851 n. 11).

Officer McBride was indisputably presented with a fast-moving situation that unfolded in a matter of seconds. Estate Plaintiffs suggest the standard of culpability is a fact question for the jury and that a reasonable jury could find that Officer McBride had time to deliberate before shooting Decedent. (Estate Opp. at 22-23.) Ninth Circuit authority does not support this assertion. *See Porter*, 546 F.3d at 1139 (finding a five-minute altercation ending in shooting left no time for deliberation). Like the officer in *Porter*, Officer McBride "faced a fast paced,

evolving situation presenting competing obligations with insufficient time for the kind of actual deliberation required for deliberate indifference." *Id*. at 1142. As such, Plaintiffs must present evidence that Officer McBride acted with a purpose to harm unrelated to law enforcement activities.

An officer acts with a purpose to harm to "induce . . . lawlessness, or to terrorize, cause harm, or kill." *Lewis*, 523 U.S. at 855. This determination requires "an appraisal of the totality of facts in a given case." *Id.* at 850. Defendants argue that Officer McBride's actions were necessary to a legitimate law enforcement purpose of stopping a safety threat. (Mot. at 14.) Plaintiffs argue that the shooting served no legitimate law enforcement purpose as demonstrated by three principal facts: (i) no other officer fired a shot; (ii) the distance of the shots (up to 44 feet); and (iii) the subsequent shots, especially the fifth and sixth shots, occurred while Decedent was falling to or on the ground. (Estate Opp. at 21-22; M.L.H. Opp. at 23-24.) This argument necessarily fails in light of the Court's conclusion that the shooting did not violate Fourth Amendment standards or otherwise warrants protection under the qualified immunity doctrine. It can hardly be said that a constitutional use of force "shocks the conscience," as that concept is understood under the Fourteenth Amendment. Indeed, in the absence of an underlying constitutional violation, Plaintiffs' familial relations substantive due process claim fails as a matter of law. *See Corales v. Bennett*, 567 F.3d 554, 569 n.11 (9th Cir. 2009) (so holding); *see also Porter*, 546 F.3d at 1141-42 (explaining overlap in analysis between Fourth Amendment excessive force claims and Fourteenth Amendment due process claims).

Accordingly, Defendants are entitled to summary judgment of Plaintiffs' third cause of action.

C.     **Plaintiffs'** *Monell* **Claim**

Plaintiffs' second cause of action is brought under 42 U.S.C. § 1983 for municipal liability. (Compl. ¶¶ 40-54.) A local government may be sued under section 1983 for an injury inflicted by its employees or agents "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiffs seek to hold the City and the LAPD liable under *Monell*.

To hold a municipality liable for the actions of its officers and employees, a plaintiff must allege one of the following: "(1) that a [municipal] employee was

acting pursuant to an expressly adopted official policy; (2) that a [municipal] employee was acting pursuant to a longstanding practice or custom; or (3) that a [municipal] employee was acting as a 'final policymaker.'" *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004). Additionally, under some circumstances, a municipality may be held liable for failure to train its police officers. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

The *Monell* claim fails for two reasons. First, Defendants correctly argue that there can be no municipal liability in the absence of an underlying constitutional violation here. (Mot. at 19 (citing *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).) Second, even if there were such a violation, Plaintiffs have submitted no evidence that a municipal policy, practice, or custom was "a moving force behind [the] violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*). While Plaintiffs list several incidents involving police shootings and several other purportedly illegal policies (Compl. ¶¶ 29, 42), they produced no evidence that those policies caused the shooting in this case. Indeed, Estate Plaintiffs' opposition is almost entirely silent as to municipal liability—only arguing that the LAPD is a proper party.[6] (Estate Opp. at 23.) To the extent Plaintiffs' *Monell* claim is based on ratification or failure to train theory, it is similarly unsupported by any record evidence. Only M.L.H. offers any argument on this point, suggesting in a single sentence that LAPD Chief of Police Michel Moore ratified Officer McBride's actions by failing to discipline her. (M.L.H. Opp. at 24.) But a failure to discipline does not equate to ratification. *See Lytle*, 382 F.3d at 987 ("A mere failure to overrule a subordinate's action, without more, is insufficient to [show ratification].").

Thus, Defendants are entitled to summary adjudication of Plaintiffs' *Monell* claim.

### D. Plaintiffs' Conspiracy Claim and Ralph Act Claim are Unopposed

Plaintiffs do not oppose summary adjudication of the sixth claim for violation of California Civil Code § 51.7, the Ralph Act, and the seventh claim for conspiracy in violation of 42 U.S.C. § 1985(3). M.L.H. explicitly states her nonopposition (M.L.H. Opp. at II); and the Estate Plaintiffs waived any challenge to summary adjudication of these claims by failing to provide any opposition.

---

[6] The parties disagree whether the LAPD is a properly named Defendant for purposes of the *Monell* claim. The Court need not reach this issue because the claim fails on its merits.

*See Stichting Pensioenfonds ABP v. Countrywide Fin.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) (failure to oppose "constitutes waiver or abandonment"). Defendants are therefore entitled to summary judgment on these claims.[7]

### E. Plaintiffs' Remaining State Law Claims

In addition to their federal claims, Plaintiffs also bring state-law claims for assault and battery (count four), wrongful death (count five), and violation of California Civil Code § 52.1 (count seven). Defendants argue—and Plaintiffs do not contest—that these claims rise and fall based on the reasonableness of Office McBride's use of force. (Estate Opp. at 23; M.L.H. Opp. at 24.) Because the Court has determined that Officer McBride's use of force was reasonable, Defendants are also entitled to summary judgment on Plaintiffs' remaining state-law claims.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is **GRANTED**. Defendants are to file a proposed judgment by August 20, 2021.

---

[7] The parties are required to meet and confer to identify issues of nonopposition to avoid wasting judicial resources. Local Rule 7-3. They failed in this obligation and are admonished that future failure in this case or in any other case may result in appropriate sanctions.