**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ESTATE OF DANIEL HERNANDEZ, by and through successors in interest, Manuel Hernandez, Maria Hernandez and M.L.H.; MANUEL HERNANDEZ, individually; MARIA HERNANDEZ, individually, | No. 21-55994 |
| | D.C. Nos. 2:20-cv-04477-SB-KS 2:20-cv-05154-DMG-KS |
| *Plaintiffs-Appellants*, | |
| and | OPINION |
| M. L. H., a minor, by and through her guardian ad litem Claudia Sugey Chavez, | |
| *Plaintiff*, | |
| v. | |
| CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; TONI MCBRIDE, | |
| *Defendants-Appellees*. | |

M. L. H., a minor, by and through her guardian ad litem Claudia Sugey Chavez,

*Plaintiff-Appellant*,

and

ESTATE OF DANIEL HERNANDEZ, by and through successors in interest, Manuel Hernandez, Maria Hernandez and M.L.H.; MANUEL HERNANDEZ, individually; MARIA HERNANDEZ, individually,

*Plaintiffs*,

v.

CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; TONI MCBRIDE,

*Defendants-Appellees*.

No. 21-55995

D.C. Nos.
2:20-cv-04477-SB-KS
2:20-cv-05154-DMG-KS

Appeal from the United States District Court
for the Central District of California
Stanley Blumenfeld, Jr., District Judge, Presiding

Argued and Submitted March 2, 2023
Pasadena, California

Filed March 21, 2024

Before:  Milan D. Smith, Jr., Daniel P. Collins, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Collins

## SUMMARY[*]

### Deadly Force/Qualified Immunity

The panel affirmed the district court's grant of summary judgment to the City of Los Angeles, the Los Angeles Police Department ("LAPD"), and Officer McBride on plaintiffs' federal claims, and reversed the district court's grant of summary judgment on several of plaintiffs' state law claims in plaintiffs' 42 U.S.C. § 1983 action arising from the shooting death of Daniel Hernandez during a confrontation with LAPD officers.

Affirming the district court's grant of summary judgment to McBride, the officer who shot Hernandez, on plaintiffs' Fourth Amendment excessive force claim, the panel held that although a reasonable jury could find that the force employed by McBride in firing her fifth and sixth shots at Hernandez was excessive, she was nonetheless entitled to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

qualified immunity because McBride did not violate clearly established law.

Affirming the district court's grant of summary judgment to all defendants on plaintiffs' Fourteenth Amendment claim, the panel held that plaintiffs failed to show that McBride acted with a purpose to harm without regard to legitimate law enforcement objectives, and therefore there was no Fourteenth Amendment violation.

Affirming the district court's grant of summary judgment to the City of Los Angeles and the LAPD on plaintiffs' *Monell* claim, the panel agreed with the district court that even if there was an underlying constitutional violation, plaintiffs failed to provide any basis for holding the City and LAPD liable for McBride's shooting of Hernandez.

The panel reversed the district court's grant of summary judgment to defendants with respect to plaintiffs' state law claims for assault, wrongful death, and violation of the Bane Act. Because the reasonableness of McBride's final volley of shots presented a question for a trier of fact, the district court erred in dismissing these state law claims based on its determination that McBride's use of force was reasonable.

## COUNSEL

Gerald P. Peters (argued), Law Office of Gerald Philip Peters, Thousand Oaks, California; Arnoldo Casillas, Casillas & Associates, Long Beach, California; Denisse O. Gastelum, Gastelum Law APC, Long Beach, California; for Plaintiff-Appellants Estate of Daniel Hernandez, Manuel Hernandez and Maria Hernandez.

Narine Mkrtchyan (argued), Glendale, California; Melanie T. Partow, Law Offices of Melanie Partow, Long Beach, California; Paul L. Hoffman, Schonbrun Seplow Harris Hoffman & Zeldes LLP, Hermosa Beach, California; for Plaintiff-Appellant M.L.H.

Kevin E. Gilbert (argued) and Carolyn Aguilar, Orbach Huff & Henderson LLP, Pleasanton, California; Colleen R. Smith and Jonathan H Eisenman, Deputy City Attorneys, Los Angeles City Attorney's Office, Los Angeles, California; for Defendants-Appellees.

James L. Buchal, Murphy & Buchal LLP, Portland, Oregon, for Amicus Curiae National Police Association.

## OPINION

COLLINS, Circuit Judge:

These consolidated actions under 42 U.S.C. § 1983 arise from the shooting death of Daniel Hernandez during a confrontation with officers of the Los Angeles Police Department ("LAPD") on April 22, 2020. Plaintiffs-Appellants, who are the Estate, parents, and minor daughter of Hernandez, asserted a variety of federal and state law claims against the City of Los Angeles ("City"), the LAPD, and the officer who shot Hernandez, Toni McBride. The district court granted summary judgment to Defendants on all claims, and Plaintiffs appeal. We conclude that, although a reasonable jury could find that the force employed by McBride was excessive, she is nonetheless entitled to qualified immunity on Plaintiffs' Fourth Amendment excessive force claim. We also hold that the district court

properly granted summary judgment to all Defendants on Plaintiffs' remaining federal claims. However, because the reasonableness of McBride's force presents a triable issue, the district court erred in granting summary judgment on that basis as to certain of Plaintiffs' state law claims. Accordingly, we affirm in part, reverse in part, and remand.

## I

### A

During the late afternoon of April 22, 2020, uniformed officers Toni McBride and Shuhei Fuchigami came upon a multi-vehicle accident at the intersection of San Pedro Street and East 32nd Street in Los Angeles. They decided to stop and investigate the situation. Video footage from the patrol car and from McBride's body camera captured much of what then transpired.[1]

As the officers arrived near the intersection, they observed multiple seriously damaged vehicles, some with people still inside, and at least two dozen people gathered at the sides of the road. As the officers exited their patrol car, the car's police radio stated that the "suspect's vehicle" was "black" and that the suspect was a "male armed with a knife." A bystander immediately told the officers about someone trying to "hurt himself," and Fuchigami stated loudly, "Where is he? Where's he at?" In response, several bystanders pointed to a black pickup truck with a heavily damaged front end that was facing in the wrong direction

---

[1] Because no party contends these videotapes were "doctored" or "altered," or that they lack foundation, we "view[] the facts in the light depicted by the videotape." *See Scott v. Harris*, 550 U.S. 372, 378, 380–81 (2007). However, to the extent that a fact is not clearly established by the videotape, we view the evidence "in the light most favorable to the nonmoving part[ies]," *i.e.*, Plaintiffs. *Id.* at 380.

near two parked vehicles on the southbound side of San Pedro Street.  The officers instructed the crowd to get back, and McBride drew her weapon.  One nearby driver, who was sitting in her stopped sedan, told McBride through her open car window that "he has a knife."  McBride asked her, "Why does he want to hurt himself?" and the bystander responded, "We don't know.  He's the one who caused the accident." McBride instructed that bystander to exit her car and go to the sidewalk, which she promptly did.  McBride then shouted to the bystanders in both English and Spanish that they needed to get away.  At the same time, the police radio announced that the suspect was "cutting himself" and was "inside his vehicle."  McBride then asked her partner, "Do we have less lethal?"  Referencing the smashed pickup truck, McBride said, "Is there anybody in there?"  She then stated, "Hey, partner, he might be running."

As McBride faced the passenger side of the truck, which was down the street, she then saw someone climb out of the driver's side window.  McBride yelled out, "Hey man, let me see your hands.  Let me see your hands man," while a bystander yelled, "He's coming out!"  Daniel Hernandez then emerged shirtless from behind the smashed black pickup truck, holding a weapon in his right hand.  As he did so, Officer McBride held her left hand out towards Hernandez and shouted, "Stay right there!"  Hernandez nonetheless advanced towards McBride in the street, and he continued to do so as McBride yelled three times, "Drop the knife!"  While Hernandez was coming towards her, McBride backed up several steps, until she was standing in front of the patrol car.

Hernandez began yelling as he continued approaching McBride, and he raised his arms out by his sides to about a 45-degree angle.  McBride again shouted, "Drop it!"  As

Hernandez continued yelling and advancing with his arms out at a 45-degree angle, Officer McBride fired an initial volley of two shots, causing Hernandez to fall to the ground on his right side, with the weapon still in his right hand. At the point that McBride fired at Hernandez, he was between 41–44 feet away from her.

Still shouting, Hernandez rolled over and leaned his weight on his hands, which were pressed against the pavement. He began pushing himself up, and he managed to get his knees off the pavement. As Hernandez started shifting his weight to his feet to stand up, McBride again yelled "Drop it!" and fired a second volley of two shots, causing Hernandez to fall on his back with his legs bent in the air, pointing away from McBride. Hernandez began to roll over onto his left side, and as he did this, McBride fired a fifth shot. Hernandez then continued to roll over, so that he was again facing McBride. His bent left knee was pressed against the ground, and he placed his left elbow on the street, as if to push himself upwards. But Hernandez started to collapse to the ground, and just as he did so, McBride fired a sixth shot. Hernandez then lay still, face-down on the street, as McBride and other officers approached him with their pistols drawn. McBride's body camera clearly shows that the weapon was still in Hernandez's right hand as an officer approached and took it out of his hand.[2] The weapon turned out not to be a knife, but a box cutter with two short blades at the end. Starting from the point at which Hernandez came out from behind the truck until he collapsed

---

[2] M.L.H.'s assertion that Hernandez was unarmed during the latter part of the incident is thus "blatantly contradicted" by the videotape. *Scott*, 550 U.S. at 380–81.

on the ground, the entire confrontation lasted no more than 20 seconds.  All six shots were fired within eight seconds.

Hernandez died from his injuries.  A forensic pathologist retained by Plaintiffs opined that McBride's sixth shot—which the pathologist concluded "more likely than not" struck Hernandez in the top of his head before ultimately lodging inside the tissues in his neck—caused "[t]he immediately fatal wound in [Hernandez's] death."  The pathologist further concluded that "[t]he next most serious wound was the wound to [Hernandez's] right shoulder that involved the lung and liver," which he opined was "more likely than not" inflicted by McBride's fourth shot. However, he stated that the shoulder wound "would not . . . have produced immediate death" and that "[w]ith immediate expert treatment, this wound alone may have been survivable."   In Defendants' response to Plaintiffs' oppositions to summary judgment, Defendants did not raise evidentiary objections to the forensic pathologist's report, nor did they provide any basis for rejecting its conclusions as a matter of law.

## B

In May and June of 2020, Hernandez's parents (Manuel and Maria Hernandez) and his minor daughter (M.L.H.) (collectively, "Plaintiffs") filed separate § 1983 actions alleging constitutional violations in connection with the shooting death of Hernandez.  Shortly thereafter, the district court formally consolidated the two cases for all purposes, and Plaintiffs filed a consolidated complaint against the City of Los Angeles ("the City"), the Los Angeles Police Department ("LAPD"), and McBride (collectively, "Defendants").   The operative consolidated complaint alleged three federal claims that remain at issue in this

appeal: (1) a Fourth Amendment excessive force claim brought against McBride by Plaintiffs, acting on behalf of Hernandez's Estate; (2) a Fourteenth Amendment claim for interference with familial relations brought by Plaintiffs on their own behalf against all Defendants; and (3) a claim under *Monell v. Department of Social Services of the City of N.Y.*, 436 U.S. 658 (1978), by Plaintiffs, on behalf of the Estate and themselves, against the City and LAPD. The complaint also asserted pendent state law claims for, *inter alia*, assault, wrongful death, and violation of the Bane Act (Cal. Civ. Code § 52.1).

In August 2021, the district court granted Defendants' motion for summary judgment on all claims. The court held that, as a matter of law, McBride did not use excessive force in violation of the Fourth Amendment but that, even if she did, she was entitled to qualified immunity. The court also held that McBride's actions did not "shock the conscience" and that the Fourteenth Amendment claim therefore lacked merit as a matter of law. The court concluded that the *Monell* claim failed both because there was no underlying constitutional violation and because, even if there were such a violation, Plaintiffs had not established any basis for holding the City and LAPD liable. Finally, the court held that, because all parties agreed that the remaining state law claims for assault, wrongful death, and violation of the Bane Act "r[o]se or f[e]ll based on the reasonableness of Officer McBride's use of force," summary judgment was warranted on these claims as well.

Plaintiffs timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II

We first address Plaintiffs' claim, asserted on behalf of Hernandez's Estate, that McBride used excessive force in violation of the Fourth Amendment.

### A

A police officer's application of deadly force to restrain a subject's movements "is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v, Garner*, 471 U.S. 1, 7 (1985); *see Kisela v. Hughes*, 584 U.S. 100, 103–07 (2018) (applying Fourth Amendment standards to a police shooting of a suspect confronting another person with a knife). Accordingly, any such use of deadly force must be "objectively reasonable." *Graham v. O'Connor*, 490 U.S. 386, 397 (1989).

In evaluating whether a particular use of force against a person is objectively reasonable under the Fourth Amendment, "the trier of fact should consider all relevant circumstances," including, as applicable, "the following illustrative but non-exhaustive factors: 'the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.'" *Demarest v. City of Vallejo*, 44 F.4th 1209, 1225 (9th Cir. 2022) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). The overall assessment of these competing factors must be undertaken with two key principles in mind. First, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kisela*, 584

U.S. at 103 (citation omitted).  Second, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* (citation omitted).

We first consider whether, under these standards, McBride "acted reasonably in using deadly force" at all. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).  We agree with the district court that, based on the undisputed facts, McBride's initial decision to fire her weapon at Hernandez was reasonable as a matter of law.

The "most important" consideration in assessing the reasonableness of using deadly force is "whether the suspect posed an 'immediate threat to the safety of the officers or others,'" *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citations omitted), and here the undisputed facts establish that the "threat reasonably perceived by the officer," *Demarest*, 44 F.4th at 1225 (citation omitted), was substantial and imminent.  At the time that McBride fired her first shot, Hernandez had ignored her instruction to "Stay right there!" and instead advanced towards her while holding a weapon that McBride had been told repeatedly was a knife. He did so while extending his arms out and yelling in McBride's direction, and, as he continued approaching her, he ignored four separate commands to drop the knife.  Under these circumstances, use of deadly force to eliminate the objectively apparent threat that Hernandez imminently posed was reasonable as a matter of law.  *See Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a weapon does justify the use of deadly force."); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an

officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."). While Plaintiffs emphasize that Hernandez was still approximately 40 feet away from McBride when she fired, "[t]here is no rule that officers must wait until a [knife-wielding] suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force." *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (holding that shooting of approaching knife-wielding suspect within six feet was reasonable and that even shooting a knife-wielding suspect 36 feet away would not violate clearly established law).

We also conclude, however, that the evidence in this case would permit a reasonable trier of fact to find that McBride fired three temporally distinct volleys of two shots each. *See supra* at 7–9. Indeed, there is almost a two-second pause between McBride's second and third shots, and there is about a one-second pause between her fourth and fifth shots. Accordingly, even though McBride's first volley of shots was reasonable as a matter of law, we must still consider whether she "acted unreasonably in firing a total of [six] shots." *Plumhoff*, 572 U.S. at 777. On that score, *Plumhoff* holds that, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* We have cautioned, though, that "terminating a *threat* doesn't necessarily mean terminating [a] *suspect*." *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017) (emphasis added). Thus, if an initial volley of shots has succeeded in disabling the suspect and placing him "in a position where he could [not] easily harm anyone or flee," a "reasonable officer would reassess the situation rather than continue shooting." *Id.*

Applying these principles to this case, we agree with the district court that the undisputed video evidence confirms that, at the time McBride fired the second volley of shots, the "threat" that Hernandez posed had not yet "ended." *Plumhoff*, 572 U.S. at 777. Despite falling down after having been hit by two bullets, Hernandez immediately rolled over, pressed his hands against the ground, and began shifting his weight to his feet in order to stand up. All the while, he continued shouting, and he still held his weapon in his hand despite yet another instruction by McBride to drop it. McBride's third and fourth shots were thus reasonable as a matter of law.

However, McBride's final volley of shots—*i.e.*, shots five and six—present a much closer question. Immediately after the fourth shot, Hernandez was lying on his back with his legs in the air, pointing away from where McBride was. Hernandez then rolled over onto his left side such that his back was towards McBride. He was in that position—facing away from McBride and still lying on his side on the ground—when McBride fired her fifth shot. Although Hernandez was still moving at the time of that shot, he had not yet shown that he was in any position to get back up. Hernandez then continued to roll over, so that he was again facing McBride. As Hernandez, while still down on the ground, first appeared to shift his weight onto his left elbow, McBride fired her sixth shot. Under these circumstances, a reasonable trier of fact could find that, at the time McBride fired these two additional shots, the threat from Hernandez—who was still on the ground—had sufficiently been halted to warrant "reassess[ing] the situation rather than continu[ing] shooting." *Zion*, 874 F.3d at 1076. A reasonable jury could find that, at the time of the fifth and sixth shots, Hernandez "was no longer an immediate threat,

and that [McBride] should have held [her] fire unless and until [Hernandez] showed signs of danger or flight." *Id*. Alternatively, a reasonable "jury could find that the [third] round of bullets was justified." *Id*. On this record, the reasonableness of the fifth and sixth shots was thus a question for the trier of fact, and the district court erred in granting summary judgment on that issue.

**B**

McBride alternatively contends that, even if a reasonable jury could find excessive force, she is nonetheless entitled to qualified immunity. We agree.

"The doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (emphasis added)). In determining whether the applicable law is "clearly established," so as to defeat qualified immunity, the Supreme Court "has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Kisela*, 584 U.S. at 104 (citations and internal quotation marks omitted). Thus, "it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id*. at 105. Rather, the "law at the time of the conduct" must have defined the relevant constitutional "right's contours" in a manner that is "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. at 104–05 (citations omitted).

This need for "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 584 U.S. at 104 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (simplified)). Because "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' . . . police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the specific facts at issue." *Id.* (emphasis added) (citation omitted). Here, there is no such pre-existing precedent that squarely governs the factual scenario presented here.

In arguing that McBride violated clearly established law, Plaintiffs place particular emphasis on this court's decision in *Zion*, 874 F.3d at 1075–76. That is understandable because, as our earlier analysis shows, the legal principles discussed in *Zion* help to elucidate why McBride's fifth and sixth shots could be unreasonable under Fourth Amendment standards. *See supra* at 13–15. But there is a difference between concluding that *Zion* supports Plaintiffs' position on the merits and concluding that *Zion* places the outcome of this case "beyond debate." *Kisela*, 584 U.S. at 104 (citation omitted). The Supreme Court has repeatedly emphasized that, in addressing whether a particular precedent meets that latter standard, we must take account of any material factual differences in that precedent that would preclude us from saying that it "'squarely governs' the specific facts at issue." *Id.* (citation omitted); *see also City of Tahlequah*, 595 U.S. at 13–14; *Brosseau v. Haugen*, 543 U.S. 194, 200–01 (2004); *Ventura v. Rutledge*, 978 F.3d 1088, 1092 (9th Cir. 2020). Examination of our decision in

*Zion* confirms that it differs in several critical respects from the instant case and that it therefore cannot be said to have clearly established the law that governs here.

In *Zion*, the officers were called to Zion's apartment complex after he had suffered several seizures and assaulted his mother and roommate with a knife. 874 F.3d at 1075. As the first officer arrived at the complex, "Zion ran at him and stabbed him in the arms." *Id*. A second arriving officer witnessed the stabbing and then shot at Zion nine times from about 15 feet away while Zion was running back towards the apartment complex. *Id*. After Zion fell to the ground, the second officer ran up to him and fired "nine more rounds at Zion's body from a distance of about four feet, emptying his weapon." *Id*. At that point, Zion "curl[ed] up on his side" but was "still moving." *Id*. After taking a pause and "walk[ing] in a circle," the officer then took "a running start and stomp[ed] on Zion's head three times." *Id*. "Zion died at the scene." *Id*. On appeal from a grant of summary judgment to the defendants, the plaintiff (Zion's mother) did not challenge the "initial nine-round volley," and instead only "challenge[d] the second volley (fired at close range while Zion was lying on the ground) and the head-stomping." *Id*. In concluding that there was a triable issue of excessive force, we emphasized that there were several disputed issues of fact that, if resolved in the plaintiff's favor, would warrant a finding that the second volley of shots was unreasonable. *Id*. at 1075–76. In particular, we held that a jury needed to resolve the parties' factual disputes as to whether "Zion was trying to get up"; "[w]hether the knife was still in Zion's hand or within his reach"; and "whether [the officer] thought Zion was still armed." *Id*. at 1076 & n.2.

This case differs from *Zion* as to each of these critical facts.  The video evidence in this case clearly shows that, even after the fourth shot, Hernandez continuously moved in a way that gave the objective appearance of trying to get up; the video evidence shows that Hernandez never dropped his weapon and still had it in his hand at the end of the episode; and McBride's continued instructions to Hernandez to drop the knife confirm that she continued to believe that he was armed.   Although we conclude that *Zion* is persuasive authority that supports a finding of unreasonableness here, the case is sufficiently and materially different on its facts that we cannot say that it "'squarely govern[ed]' the specific facts" of this case or placed that outcome "beyond debate." *Kisela*, 584 U.S. at 104 (citations omitted).

Plaintiffs also rely on *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001), but the Supreme Court "has already instructed the Court of Appeals not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law." *Kisela*, 584 U.S. at 106.  The Court's summary of *Doerle* in *Kisela* equally confirms why it does not squarely govern the facts of this case: "*Deorle* involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been 'physically compliant and generally followed all the officers' instructions'; and he had been under police observation for roughly 40 minutes." *Id*. at 106–07 (citing *Deorle*, 272 F.3d at 1276, 1281–82). Nearly all of these key factual premises underlying *Doerle*'s holding are missing in this case.

The other Ninth Circuit cases on which Plaintiffs rely are even more strikingly distinguishable from this case.  Indeed, in addition to other significant differences, none of the cited

cases even involves a situation (such as this one or *Zion*) in which the use of deadly force initially *was* reasonable. *See Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019) (holding that the officer's shooting of a suspect reported to have earlier threatened someone with a knife was unreasonable under clearly established law where a jury could find that the officer "responded to a misdemeanor call, pulled his car into a well-lit alley with his high beam headlights shining into [the suspect's] face, never identified himself as a police officer, gave no commands or warnings, and then shot [the suspect] within a matter of seconds, even though [the suspect] was unarmed, had not said anything, was not threatening anyone, and posed little to no danger to [the officer] or anyone else"); *Hayes*, 736 F.3d at 1235 (holding that immediate shooting of suicidal man who revealed a knife, without ordering him to stop or drop the knife, was unreasonable).

Plaintiffs argue that, even apart from its specific facts, *Zion* clearly establishes the broader proposition that "the use of deadly force against a non-threatening suspect is unreasonable." *Zion*, 874 F.3d at 1076. But this overbroad reading of *Zion* is directly contrary to *Kisela*, which squarely held that we may not define "clearly established" law in the excessive force context at this "high level of generality." *Kisela*, 584 U.S. at 104 (citation omitted). Indeed, *Zion* noted that the "boundary" line is "murky" when it comes to defining exactly when the permissible use of deadly force against a suspect who "poses an immediate threat" must be *halted* on the ground that "the suspect no longer poses a threat." *Zion*, 874 F.3d at 1075. Given that *Zion* itself noted that the relevant line is "murky," it can hardly be said to have *clearly* established a general rule that places the outcome of this case beyond debate.

We acknowledge that, even when, as here, there is no relevant "[p]recedent involving similar facts" that "can help move a case beyond the otherwise 'hazy border between excessive and acceptable force,'" generally framed rules can still "create clearly established law" in "an 'obvious case.'" *Kisela*, 584 U.S. at 105 (citation omitted). But to meet that high standard, Plaintiffs would have to show that "*any* reasonable official in the defendant's shoes would have understood that he was violating" the Constitution. *Id.* (quoting *Plumhoff*, 572 U.S. at 778–79 (emphasis added)). That demanding standard reflects the long-standing principle that "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (citation omitted). Plaintiffs have not satisfied that standard here. As our earlier discussion of the merits of this case makes clear, this is not an obvious case, but rather a close and difficult one. Thus, even granting that McBride's fifth and sixth shots may have been unreasonable, this is not an obvious situation in which *every* reasonable officer would have understood that the law forbade firing additional shots at the already wounded Hernandez as he plainly appeared to continue to try to get up.

Because McBride did not violate clearly established law in firing her third volley of shots, we conclude that she is entitled to qualified immunity. On that basis, we affirm the grant of summary judgment to McBride on Plaintiffs' Fourth Amendment excessive force claim.

## III

We next address Plaintiffs' challenge to the district court's dismissal of their Fourteenth Amendment claim against all Defendants.

We have held that "parents have a Fourteenth Amendment liberty interest in the companionship and society of their children" and that "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citation omitted). We have extended this reasoning to also cover the converse situation of "a 'child's interest in her relationship with a parent.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (quoting, *inter alia*, *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. De la Viña*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc)). In describing the sort of conduct that would qualify as "shock[ing] the conscience" under this line of cases, we have drawn a distinction between cases where "actual deliberation is practical" and those in which it is not. *Zion*, 874 F.3d at 1077 (citation omitted). In the former situation, liability may be established by showing that the officer acted with "deliberate indifference." *Id.* (citation omitted). But where deliberation is impractical, we require a showing that the officer "acted with 'a purpose to harm without regard to legitimate law enforcement objectives.'" *Id.* (citation omitted).

The outcome of this case, under these standards, is dictated by our decision in *Zion*. In that case, we held that the "two volleys [of shots] came in rapid succession, without time for reflection" and that the more demanding liability standard therefore applied. *Zion*, 874 F.3d at 1077. Given that the two volleys in *Zion* occurred six seconds apart, *see id.* at 1075, the one-second gap between McBride's second and third volleys likewise constitutes, under *Zion*, insufficient time to reflect. Plaintiffs therefore must show that McBride "acted with 'a purpose to harm without regard

to legitimate law enforcement objectives.'"  *Id.* at 1077 (citation omitted).

Plaintiffs wholly failed to raise a triable issue under this standard.  Here, as in *Zion*, "[w]hether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect."  *Zion*, 874 F.3d at 1077; *see also Nehad*, 929 F.3d at 1134, 1139 (holding that, although there was a triable issue as to whether officer used excessive force in firing on a knife-wielding suspect who "didn't make any offensive motions" and "was actually not a lethal threat" to the officer, the plaintiffs' Fourteenth Amendment claim nonetheless failed because there was "no evidence that [the officer] fired on [the decedent] for any purpose other than self-defense, notwithstanding the evidence that the use of force was unreasonable").[3]

Because there was no Fourteenth Amendment violation, the district court correctly granted summary judgment to all Defendants on this claim.

## IV

As noted earlier, the district court dismissed Plaintiffs' *Monell* claim against the City and LAPD, concluding that (1) there could be no municipal liability when there was no underlying constitutional violation; and (2) even if there was such a violation, Plaintiffs had failed to provide any basis for holding the City and LAPD liable for McBride's shooting of Hernandez.  The district court's first rationale fails in light of our conclusion that there is a triable issue as to whether

---

[3] To the extent that M.L.H. contends that she was not provided a sufficient opportunity to conduct additional discovery with respect to her claims, including her Fourteenth Amendment claim, we reject that argument for reasons explained below.  *See infra* section IV.

McBride's final volley of shots was excessive under the applicable Fourth Amendment standards. We nonetheless agree with the district court's second rationale, and on that basis, we affirm the grant of summary judgment to the City and LAPD on the *Monell* claim.

As to Hernandez's parents and Estate, the district court noted that their summary judgment "opposition [was] almost entirely silent as to municipal liability" and merely argued that LAPD was properly named as an *additional* municipal Defendant with the City. The same is true of their opening brief in this court. Even assuming *arguendo* that Hernandez's parents and Estate have not thereby completely forfeited their *Monell* claim, they have failed to provide any basis for reversal beyond what is stated by their co-Plaintiff (M.L.H.) in the latter's opening brief.

For her part, M.L.H. does not contest the district court's determination that, based on the existing summary judgment record, there was insufficient evidence to establish municipal liability under *Monell*. Instead, M.L.H. seeks reversal of the dismissal of the *Monell* claim solely on the ground that the district court assertedly abused its discretion in refusing to extend the discovery cut-off deadline established under the court's scheduling order issued under Federal Rule of Civil Procedure 16(b). We reject this contention.

In requesting a modification of the discovery schedule set forth in a Rule 16(b) scheduling order, a party must make a showing of "good cause." FED. R. CIV. P. 16(b)(4). As we have explained, "[t]he good cause standard of Rule 16(b) 'primarily considers the diligence of the party seeking'" the modification, and "[i]f that party was not diligent, the inquiry should end." *Branch Banking & Tr. Co.*, *v. D.M.S.I.,*

*LLC*, 871 F.3d 751, 764 (9th Cir. 2017) (citation omitted). The district court did not abuse its discretion in concluding that M.L.H. had failed to show diligence in pursuing discovery.

As the court noted, M.L.H. did not serve any formal discovery for almost six months, and she "waited until the very end of discovery to notice depositions that she knew she wanted to take at the outset of the case." By proceeding in this fashion, the court concluded, M.L.H. "left herself no margin for error." On appeal, M.L.H. contends that the discovery deadline should have been extended in light of the asserted inadequacy of Defendants' responses to the discovery propounded by the *other* separately represented Plaintiffs (*i.e.*, Hernandez's parents and Estate). But as M.L.H. herself notes, *M.L.H.* "could not immediately act" to address those deficiencies "by way of a motion to compel because *she was not the party who propounded the requests*" (emphasis added). By failing to take *any* steps to serve her own formal discovery requests for six months, M.L.H. unnecessarily placed herself in a position in which she was unable to bring discovery motions until fairly late in the process, and thus needed to conduct a range of discovery at the eleventh hour. M.L.H. also argues that the failure to serve discovery during the six-month period from August 2020 until February 2021 should have been excused in light of the Covid pandemic, but that explanation does not justify a complete failure to serve even *written* discovery before February 2021. Although the district court's ruling may have been harsh, we cannot say that the court abused its discretion in concluding that M.L.H. had not shown sufficient diligence and that an extension of the discovery cut-off was unwarranted.

Because Plaintiffs have provided no other basis for concluding that the *Monell* claim should not have been dismissed, we affirm the district court's grant of summary judgment on that claim.

## V

Finally, we turn to Plaintiffs' state-law claims for (1) assault, (2) wrongful death, and (3) violation of California Civil Code § 52.1. The district court's sole reason for granting summary judgment to Defendants on these claims was its "determinat[ion] that Officer McBride's use of force was reasonable." Because we conclude that the reasonableness of McBride's final volley of shots presents a question for a trier of fact, the district court erred in dismissing these state law claims on that ground. We therefore reverse the district court's dismissal of these claims.

## VI

For the reasons we have stated, we affirm the district court's grant of summary judgment to Defendants on all of Plaintiffs' federal claims, and we reverse the district court's summary judgment with respect to Plaintiffs' state law claims for assault, wrongful death, and violation of the Bane Act (Cal. Civ. Code § 52.1).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**